Manuel BORRERO, Plaintiff,

v.

John J. CALLAHAN,[1] Acting Commissioner of Social Security, Defendant.

No. 3:96CV920 (HBF).

United States District Court, D. Connecticut.

March 30, 1998.

---

1. Effective March 1, 1997, President Clinton appointed John J. Callahan to serve as Acting Commissioner of Social Security, to succeed Shirley S. Chater. Pursuant to Rule 25(d)(1), Fed. R. Civ. P., the court substitutes John J. Callahan for Shirley S. Chater as defendant in this action.

Ivan Michael Katz, Law Offices of Ivan M. Katz, New Haven, CT, for Plaintiff.

Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

## RULING ON PENDING MOTIONS

FITZSIMMONS, United States Magistrate Judge.

Manuel Borrero filed this action seeking review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner denying his claim for Disability Insurance Benefits and Supplemental Security Income ("SSI") Benefits under the Social Security Act. Plaintiff has filed a motion for an order remanding the case for further proceedings and a motion for summary judgment. In response, defendant filed a motion seeking an order affirming the decision of the Commissioner. For the reasons that follow, plaintiff's motions are granted to the extent that this case is remanded for further proceedings and defendant's motion is denied.

## BACKGROUND

Plaintiff was born on January 1, 1947, (R. 121),[2] and obtained a second grade education in Puerto Rico. (R. 159.) He came to the United States in 1959. (R. 104.) Although plaintiff can speak English, he cannot read or write in English and has a limited ability to read in Spanish. (R. 75.) He last worked doing painting and maintenance for a catering company in June 1992. (R. 77, 159, 163.) He also worked for a landscaping company, loaded and unloaded trucks and cut tobacco. (R. 78, 159, 163.) In his last position, plaintiff walked about two hours in an eight hour day, stood about six hours and sat one hour. He constantly had to bend and reach and frequently lifted up to fifty pounds. (R. 160.) Plaintiff was let go from his last job in June 1992. (R. 77, 79, 159, 163.) Plaintiff's period of insured status for Title II purposes expired on December 31, 1996. (R. 153.) Plaintiff states that he became disabled on December 15, 1992. (R. 104.)

Plaintiff filed applications for disability insurance benefits and SSI benefits on March 25, 1993. (R. 103–15, 121–24.) The applications were denied on June 28, 1993. (R. 116–18, 133–35.) In response to plaintiff's July 12, 1993 request for reconsideration, (R. 136), the agency, on September 17, 1993, issued a notice of reconsideration upholding the denial of benefits. (R. 147–49.) The hearing before the administrative law judge ("ALJ") was held on October 27, 1994. (R. 66–102.) Plaintiff appeared with counsel at the hearing. (R. 68.)

Plaintiff testified that he suffers from chest pain that feels like "sharp needles" and constant numbness. (R. 72, 85.) He is sometimes dizzy. (P. 72.) He has collapsed on the street after feeling dizzy and woke up in the hospital. (R. 73.) He currently take Nitrostat and an unidentified medication. (R. 74.) Plaintiff lives in a shelter and spends much of the day at a local soup kitchen. When the soup kitchen closes, plaintiff sits in the park until the shelter opens. (R. 80.) When plaintiff walks, his legs bother him. He feels short of breath and must sit and rest. Sitting sometimes bothers his back. (R. 81.) His girlfriend provides him food and does his laundry. (R. 82.)

The ALJ also heard testimony from a medical expert, a cardiologist who reviewed plaintiff's medical records through December 1993. (R. 87–101.) The medical expert opined that plaintiff was disabled during ten months in 1993 because of ischemic[3] heart disease. (R. 89.) He stated that plaintiff demonstrated no functional limitation other than during the two or three months following coronary bypass surgery which was performed in January 1993. (R. 93.) The medical expert also indicated that plaintiff's musculoskeletal chest discomfort was not disabling, although it might impact his lifting ability. (R. 99–100.)

At the conclusion of the hearing, the ALJ indicated that he would refer plaintiff for a consultative orthopedic examination. The record was left open to enable plaintiff to provide medical records for 1994. The ALJ stated that, after the medical records were submitted, he would prepare interrogatories to the medical expert. (R. 100.)

The ALJ also had several disability reports completed by the plaintiff. At the time of his initial applications, plaintiff stated that his treating physician had restricted him to lifting no more than ten pounds. Plaintiff indicated that he could cook twice a day, pick up around the house and dust. He could not sweep or mop and had someone help with laundry and shopping. He did some walking for recreation, watched television and visited friends with his girlfriend about once a month. (R. 158, 183–85.) After plaintiff moved to the shelter, he spent his days sitting in the park until the shelter opened in the evening. (R. 188.)

At the time he requested reconsideration, plaintiff stated that he experienced pain in his back and leg, sharp pain in his chest and dizziness. He could not bend because of the pain. His back hurt him when he walked

---

**2.** The administrative record filed by the Commissioner shall be referred to as "R.".

**3.** A localized anemic condition caused by a mechanical obstruction of the blood supply often the result of arterial narrowing. Stedman's Medical Dictionary 894 (26th ed.1995).

and he experienced difficulty getting up from a seated position. (R. 169.) Plaintiff continued to be able to care for his personal needs and cook. (R. 171.) He visited his treating physician every two months and the local clinic every three weeks to obtain pain medication. (R. 170.)

At the time he requested a hearing, plaintiff indicated that he got dizzy when he walked. Any arm movement caused chest pain and he was short of breath more frequently. He experienced back pain while sitting and walking. (R. 177.) The severe chest pain often extended down his left side into his leg. (R. 179.) Plaintiff stated that he was no longer able to go for walks and spent his time sitting around. (R. 177, 179.)

In April 1993, plaintiff compared his pain to a strong heart beat "like a kick" and stated that the pain woke him about twice a night. (R. 183.) In a pain questionnaire completed in July 1993, plaintiff described his pain as constant pain in his chest that affected his breathing. (R. 181.) The pain was brought on by lifting, pushing or walking. (*Id.*)

The ALJ had before him medical evidence from 1993. A summary of the evidence follows.

In January 1993, plaintiff was admitted to the Yale–New Haven Hospital in New Haven, Connecticut. (R. 189–93.) He underwent a coronary artery bypass graft and was discharged on January 23, 1993, with prescriptions for aspirin and pain medication. (R. 189–90.) On February 2, 1993, plaintiff was again admitted to the hospital. (R. 214–23.) He was experiencing atypical chest pain. The physicians ruled out myocardial infarction[4] and determined that the pain was "consistent with a component of musculoskeletal chest pain arising in the left costochondrial joints[5] as well as referred pain from pericardial inflammation." (R. 214.) A Thal-

lium exercise test performed on February 5, 1993 was normal. (R. 220.)

In a February 15, 1993 letter, plaintiff's treating physician, cardiologist Dr. Forrester Lee, reported to the surgeon that plaintiff was gradually returning to his normal level of exertional capacity. (R. 255.) The treating physician noted, however, that plaintiff experienced mild left-sided chest pain that worsened with deep breathing, musculoskeletal symptoms associated with wound healing and a mild degree of pericarditis.[6] (R. 255–56.) In a March 23, 1993 letter to the social security agency, plaintiff's treating physician indicated that plaintiff's cardiac condition was then stable. (R. 224.) In April, the clinic physicians indicated that plaintiff had been experiencing post cardiac surgery chest wall syndrome since January 1993, and referred the agency to plaintiff's cardiologist, Dr. Lee. (R. 226.)

In May 1993, plaintiff underwent a consultative examination with Dr. Joseph Ayoub. (R. 229–232.) Dr. Ayoub indicted that plaintiff suffered from coronary artery disease and lower back pain syndrome. He observed evidence of musculoskeletal chest pain and lower back pain with minimal decreased range of motion. Dr. Ayoub suggested that plaintiff be restricted from prolonged sitting, standing, climbing, balancing, bending, stooping, carrying and lifting. (R. 231.)

Two residual functional capacity assessments were performed by the agency. In June 1993, the plaintiff was reported able to occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk or sit for up to six hours in an eight hour work day. He had an unlimited ability to push or pull. (R. 127.) The evaluating physician noted that these findings were consistent with Dr. Ayoub's restrictions because plaintiff's stamina was expected to improve as long as he did not develop any complications. (R. 131.) In September 1993, the second residual functional capacity assessment decreased plain-

---

**4.** An insufficiency of arterial blood supply to an area of the heart muscle. Stedman's Medical Dictionary 868.

**5.** The cartilaginous joints between the sternal end of a rib and the rib cartilage. Stedman's Medical Dictionary 403, 906.

**6.** An inflammation of the membrane covering the heart. Stedman's Medical Dictionary 1326–27.

tiff's lifting ability to occasionally lifting twenty pounds and frequently lifting ten pounds. The change was attributed to plaintiff's continued chest pain and low back pain. (R. 140.)

In May 1993, plaintiff sought treatment at the Hill Health Center for chest wall pain, spasms and tenderness. (R. 233.) Also in May 1993, plaintiff's treating physician noted that plaintiff was free of symptoms of congestive heart failure or angina.[7] He noted, however, that plaintiff had a chronic and annoying left-sided chest discomfort that was exaggerated with deep breathing or change of position. Plaintiff exhibited several discrete areas of tenderness when the chest wall was palpated. (R. 236.) The treating physician opined that plaintiff's pain was caused by the slow and poor filling of his sternotomy[8] with the involvement of the costochondrial joints. (R. 236–37.) In July 1993, Hill Health Center progress notes indicate that plaintiff experienced mild, occasional chest pain brought on by extreme exertion. (R. 235.)

In August 1993, the treating physician again noted intermittent musculoskeletal chest pain involving plaintiff's incision and the costochondrial joints. Dr. Lee reported when plaintiff attempted to return to work as a restaurant helper, he developed sharp precordial chest pain of an atypical musculoskeletal nature when bending or sitting up. (R. 239.) Plaintiff experienced relief from the pain after an injection of Lidocaine, and was prescribed additional pain medication. (*Id.*)

In November 1993, while temporarily living in Florida, plaintiff was admitted to St. Joseph Hospital in Tampa, Florida. (R. 242–52.) Plaintiff underwent a percutaneous transluminal coronary angioplasty[9] to relieve coronary artery atherosclerosis[10] and unstable angina. (R. 242.)

After the hearing, plaintiff submitted to the ALJ progress notes from the Hill Health Center. (R. 266–81.) Plaintiff sought treatment and medication for chest wall tenderness and shortness of breath on February 15 and March 1, 1994. (R. 270, 271.) On March 8, 1994, plaintiff reported that the chest pain was getting sharper. (R. 272.) On March 28, 1994, he reported pain in his left arm as well as his chest. (R. 274.) In April 1994, plaintiff reported feeling pain "all the time" and the physicians questioned whether plaintiff exhibited angina. (R. 278–79.) In July 1994, plaintiff again reported chest wall tenderness and shortness of breath. (R. 280.) In November 1994, plaintiff described his symptoms as a sharp pain in his chest that extended down to his stomach, left leg and knee pain, chest numbness and upper chest tightness. All of the pain was related to movement. (R. 281.)

In February 1995, the agency scheduled a consultative examination with Dr. Anthony Camarda. (R. 299–301.) Plaintiff told Dr. Camarda that his back pain was worse than his chest pain. (R. 299.) Although he had been prescribed pain medication, the medication did not relieve the pain and plaintiff stopped taking it. Hot baths provided some relief. Despite the pain, plaintiff stated that he could walk one mile without much difficulty. (R. 300.) Dr. Camarda observed limited chest movement, some pain at the xiphoid process[11] and a "painful mount of scar tissue" that caused plaintiff pain when he bent forward or when the tissue was pressed. (*Id.*) Dr. Camarda concluded that plaintiff suffered from a mild lumbar disc problem with chronic sciatica, mild chronic chest pain as a result of the heart operation and probable condritis of the sternal junction with the ribs. (R. 301.)

On March 21, 1995, the ALJ notified plaintiff's attorney that he would have fifteen days

---

7. A severe constricting pain. Stedman's Medical Dictionary 83.

8. An incision into or through the sternum. Stedman's Medical Dictionary 1676.

9. An operation to enlarge a narrowed blood vessel by inflating and withdrawing a balloon attached to a catheter. Stedman's Medical Dictionary 87.

10. A form of arteriosclerosis, or hardening of the arteries, characterized by irregularly distributed lipid deposits in the arteries. Stedman's Medical Dictionary 135, 162.

11. The cartilage at the lower end of the sternum. Stedman's Medical Dictionary 1431.

to comment on the consultative report. Although plaintiff's attorney submitted comments, it appears from the record that these comments were not forwarded to the ALJ. Plaintiff also submitted additional medical records from Yale–New Haven Hospital to the ALJ on May 16, 1995. The ALJ did not consider these records in his decision, issued the following day. The records were forwarded to the Appeals Council and are described below.

On May 17, 1995, the ALJ denied the plaintiff's application for disability insurance benefits. (R. 46–57.) On May 24, 1995, the ALJ denied the plaintiff's request to reopen the case and reconsider the decision in light of the additional medical records which were filed but not provided to the ALJ before he issued his decision. (R. 38–41 .) On June 13, 1995, the plaintiff filed a request for review by the Appeals Council. (R. 11–12.)

In addition to the record before the ALJ, the Appeals Council also had the additional medical records from Yale–New Haven Hospital. On September 1, 1993, plaintiff was admitted to the hospital for syncope [12] or presyncope suspected to be of cardiac origin. (R. 428–29.) He was tested for myocardial infraction and that condition was ruled out. (R. 338.) He also underwent a full exercise treadmill study. He was discharged on September 3, 1993. (R. 428–29.) At a September 20, 1993 follow-up visit to his treating physician, plaintiff reported two episodes of presyncope since his discharge. He also reported severe left precordial chest pain and admitted to using cocaine on one occasion. (R. 411.)

From December 16 through 21, 1993, plaintiff was again hospitalized for chest pain. (R. 389–91.) The etiology of the pain was undetermined, but a stress exercise test suggested atypical angina. (R. 379.) On January 3, 1994, plaintiff experienced dizziness, (R. 369), and on January 7, 1994 was again admitted to the hospital to rule out myocardial infarction. (R. 382–84.)

In April 1994, plaintiff underwent testing to determine the cause of his back pain. A CT scan of the lumbar spine revealed a disc annulus bulge at L4–L5. (R. 355.)

In September 1994, plaintiff was twice admitted to the hospital to rule out myocardial infarction. (R. 338, 343.) In January 1995, plaintiff was again hospitalized for atypical chest pain. The physicians ruled out myocardial infarction, determined that plaintiff was stable from a cardiac standpoint and concluded that plaintiff's symptoms were non-cardiac in nature. (R. 303–09.)

On April 24, 1996, the Appeals Council made the Yale–New Haven Hospital records from September 1993 through March 1995 part of the record and denied the request for review. (R. 4–7.) The plaintiff then timely filed this appeal within the sixty day period following receipt of the decision of the Appeals Council.

## STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *Rodriguez v. Califano,* 431 F.Supp. 421, 423 (S.D.N.Y.1977). The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner. *Dotson v. Shalala,* 1 F.3d 571, 577 (7th Cir. 1993); *Reyes v. Harris,* 486 F.Supp. 1063, 1067 (S.D.N.Y.1980). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, "[w]hen there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unaccepta-

12. Loss of consciousness and postural tone.  Stedman's Medical Dictionary 1720.

ble risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson v. Bowen,* 817 F.2d at 986.

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). Additionally, indigent individuals may be entitled to disability benefits under the Supplemental Security Income program. 42 U.S.C. §§ 1381–1383(c). "Disability" is defined under both programs as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1), 1382c(a)(3).

Determining whether a claimant is disabled requires a five-step process. 20 C.F.R. § 404.1520. First, the court must determine whether the claimant is currently working. 20 C.F.R. §§ 404.1510(b), 404.1572(b). If the claimant is currently employed, the claim is disallowed. 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. 20 C.F.R. § 404.1520(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in appendix 1 of the regulations (the "Listings"). 20 C.F.R. § 404.1520(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(d); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. 20 C.F.R. § 404.1520(e). If the claimant cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any

alternate gainful employment. 20 C.F.R. § 404.1520(f).

■ The initial burden of establishing disability is on the claimant. 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(G). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). This may require the application of the Medical–Vocational Guidelines ("the grid") which places claimants with severe exertional impairments who can no longer perform past work into grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled. 20 C.F.R. § 404.1520(f). A proper application of the grid makes vocational testing unnecessary.

■ The grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders are not covered. 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(2). If the grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is generally required to support a finding of residual functional capacity for substantial gainful activity. *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986).

## DISCUSSION

Following the five step evaluation process, the ALJ determined that plaintiff has not engaged in substantial gainful activity since December 1992. (R. 55.) Although plaintiff presented medical evidence that he suffers from a " 'severe' impairment due to chronic musculoskeletal chest pain, status post two-vessel coronary re-vascularization and status post percutaneous transluminal coronary angioplasty and low back pain," the ALJ found that his impairments do not meet or equal any listed impairment. (*Id.*) The ALJ found plaintiff's complaints of pain credible to the extent that they limit his residual functional

capacity to work at the light level of exertion. (*Id.*) The ALJ determined that plaintiff was unable to perform his past relevant work but that he demonstrated "no significant non-exertional limitations which narrow the range of work he is capable of performing." (R. 56.) Accordingly, the ALJ applied the grid, determined that plaintiff was not disabled and denied his applications for disability insurance benefits and SSI benefits. (R. 56–57.)

Plaintiff argues that he is entitled to an order of remand in this case because he has new and material evidence that he also suffers from a mental impairment. In addition, plaintiff contends that he is entitled to summary judgment in this case because the record evidence is insufficient to support the ALJ's conclusion. The defendant argues that the ALJ's decision is supported by substantial evidence. The court considers below plaintiff's request for remand, the ALJ's evaluation of the plaintiff's subjective complaints of pain and whether the ALJ's decision is supported by substantial evidence.

## I. *Request for Remand*

Plaintiff asks the court to remand this case and order the Commissioner to take additional evidence.

A district court may remand a final decision of the Secretary pursuant to two sentences in section 405(g). Plaintiff does not specify under which sentence he is making his motion for remand.

Under sentence four of section 405(g) the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause of action for a rehearing." The district court may remand a case pursuant to sentence four of section 405(g) for the taking of additional evidence, as long as the court enters a judgment affirming, modifying or reversing the Secretary's decision. *See Sullivan v. Hudson,* 490 U.S. 877, 880, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989).

■ Sentence six of section 405(g) states: [t]he court may, on motion of the [Commissioner] made for good cause shown before

he files his answer, remand the case to the [Commissioner] for further action by the [Commissioner], and it may at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

Under sentence six, the case is remanded without an order affirming or reversing the decision of the Commissioner. In addition, the party which seeks a remand under sentence six to present additional evidence must demonstrate that the evidence is new and material, and that there is good cause why the evidence was not available earlier. *Melkonyan v. Sullivan,* 501 U.S. 89, 100, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

In his motion for remand, plaintiff fails to indicate whether he requests a remand pursuant to sentence four or sentence six of section 405(g). The fact that plaintiff contemporaneously filed a motion for summary judgment suggests that he seeks a remand pursuant to sentence four. Plaintiff argues, however, that the new evidence is material and that he can demonstrate good cause for failing to produce the evidence earlier. This language suggest that plaintiff is requesting a remand pursuant to sentence six. Because plaintiff does not indicate which type of remand he seeks, the court considers the motion under both sentences of section 405(g).

■ The court first examines plaintiff's motion under sentence six and considers whether plaintiff has demonstrated the existence of new and material evidence.

The Second Circuit applies a three-part test to determine whether a remand for new evidence should be ordered:

The [party seeking the remand] must show that the proffered evidence is (1) "new" and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced

the [Commissioner] to decide claimant's application differently. Finally, claimant must show (3) good cause for [his] failure to present the evidence earlier.

*Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (citations omitted) (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988)).

The record before the ALJ contained no evidence of mental impairment. The mental health evaluation and neuropsychological assessment sought to be added to the record, therefore, are new evidence. Thus, plaintiff satisfies the first part of the test.

The second part of the test is whether the new evidence is material and probative. The January 3, 1997 report from the Connecticut Mental Health Center Access Program indicates that plaintiff "was outreached and clinically admitted" to outreach program in September 1995. (*See* Connecticut Mental Health Center report attached to Doc. # 10.) The neuropsychological report also indicates that plaintiff had been diagnosed as suffering from major depression with psychotic episodes in 1995 when he first became associated with the outreach program while living in the shelter. (*See* Brief Neuropsychological Report attached to Doc. # 17.) The court concludes that the plaintiff's mental impairments were diagnosed during the period of his insured status. Thus, the evidence is relevant to a determination whether plaintiff is entitled to disability insurance benefits as well as SSI benefits. In addition, one report indicates that plaintiff's "illness interferes markedly with his ability to be gainfully employed for at least another year." This assessment suggest to the court that consideration of plaintiff's mental impairments might have influenced the ALJ's determination that plaintiff is not disabled.

The third requirement is good cause for failing to present the evidence earlier. "To show good cause, [the claimant] must adequately explain [his] failure to incorporate the proffered evidence into the administrative record." *Lisa v. Secretary, H & HS*, 940 F.2d 40, 45 (2d Cir.1991) (citations omitted). Plaintiff's attorney concedes that he is unaware of the exact date upon which plaintiff first sought mental health treatment. The two reports provided by plaintiff were pre-pared in January 1997, after the conclusion of the administrative proceedings in this matter. Because the reports did not exist at the time of the administrative proceedings, the court finds that plaintiff has sufficiently demonstrated good cause for failing to present them earlier.

Thus, plaintiff has satisfied the sentence six requirements for a remand to take additional evidence. Plaintiff's motion for remand and for order is granted. The court need not consider this argument under the sentence four requirements.

## II. *Evaluation of Subjective Complaints of Pain*

In support of his motion for summary judgment, plaintiff contends that the ALJ improperly rejected his complaints of back pain.

The function of the Commissioner includes evaluating the credibility of all witnesses, including the plaintiff. *Carroll v. Secretary of HHS*, 705 F.2d 638, 642 (2d Cir.1983). Although the Commissioner is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.1988) (citing *Carroll*, 705 F.2d at 643). The ALJ's findings must be consistent with the other evidence in the case. *Id.* 859 F.2d at 261. After reviewing the ALJ's decision, the court concludes that the ALJ's credibility finding is not set forth with sufficient specificity.

In evaluating subjective symptoms such as pain, a claimant must first demonstrate the existence of a medically determinable impairment that could reasonably be expected to produce the symptom. After such an impairment has been identified, the intensity and persistence of the claimant's pain are evaluated based on all available evidence. The claimed pain will not be rejected simply because the objective medical evidence does not support the claim. Other factors which will be considered include the claimant's medical history, diagnosis, daily

activities, prescribed treatments, efforts to work and any functional limitations or restrictions caused by the pain. 20 C.F.R. § 404.1529. In addition, "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work . . . ." Social Security Ruling ("SSR") 95–5p,[13] 1995 WL 670415 (S.S.A.).

In this case, the plaintiff argues that he has consistently complained of pain in his chest and back. The ALJ rejected plaintiff's complaints of back pain because the record contained "no objective medical evidence to establish that the claimant in fact has a back condition" and never "sought treatment for back pain." (R. 53.) The record evidence does not support this statement. In April 1994, in response to complaints of back pain, plaintiff underwent a CT scan of his lumbar spine. The scan revealed a disc annulus bulge at L4–L5. (R. 355.) Thus, the ALJ improperly failed to consider all of plaintiff's subjective allegations in determining his residual functional capacity. (R. 17–20.)

In addition, the ALJ based his decision on plaintiff's medical records only through December 1993. He did not consider the remaining medical records and has not obtained the medical expert's evaluation of these records. Further, the decision includes no personal observations of plaintiff by the ALJ as required under SSR 95–5p.

Upon remand, the ALJ is directed to assess the plaintiff's credibility and evaluate his subjective complaints of pain in light of all the record medical evidence.

III. *Evidence in Support of ALJ's Determination*

Defendant contends that the ALJ's decision is supported by substantial evidence. This court disagrees.

Once a claimant demonstrates that he cannot perform his past relevant work, the ALJ bears the burden of demonstrating that jobs exist in sufficient numbers in the national economy which the claimant can perform. *See Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). If the claimant exhibits only exertional impairments, the ALJ can determine whether he is disabled by consulting the grid. *See* 20 C.F.R. § 404.1520(f). If, however, the claimant also exhibits nonexertional impairments, the ALJ must consult a vocational expert to determine whether the claimant possesses the residual functional capacity for substantial gainful activity. *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986).

In the present case, the ALJ found that plaintiff was unable to perform his past relevant work which required at least the "medium level" of exertion. (R. 56.) Thus, the ALJ bore the burden of demonstrating that plaintiff had the residual functional capacity to perform substantial gainful activity and to identify such jobs. The ALJ found that plaintiff "has no significant non-exertional limitation which narrow the range of work he is capable of performing," applied the grid and concluded that "[b]ased upon an exertional capacity for light work," plaintiff "is capable of making a vocational adjustment to work which exists in significant numbers in the national economy." (*Id.*)

This court has determined that the ALJ failed to properly evaluate plaintiff's subjective complaints of pain and that the case should be remanded for additional evidence of a mental impairment. Thus, it concludes that the ALJ's determination that plaintiff does not exhibit any significant nonexertional limitations is not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d at 986 (improper to uphold finding of no disability where there is reasonable basis for doubt that ALJ applied correct legal principles).

On remand, the ALJ is directed to consider all of plaintiff's subjective complaints in

---

**13.** Although SSR 95–5p was not published until October 31, 1995, after the ALJ issued her decision in this case, it does not concern a newly created policy. SSR 95–5p replaces the section of SSR 88–13 and SSR 90–1p which is entitled "Importance of Considering Allegations of Pain in Assessing RFC and Explaining Conclusions Reached." SSR 95–5p.

accordance with the Commissioner's regulations, review any additional evidence presented concerning a mental impairment and, if necessary, obtain the testimony of a vocational expert to determine whether plaintiff is disabled.

## CONCLUSION

For the reasons stated above, the defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. # 14] is DENIED. Plaintiff's Motion for Remand and for Order [Docs.è10–1, 10–2] is GRANTED and Plaintiff's Motion for Summary Judgment [Doc. # 12] is GRANTED in part and DENIED in part. The decision of the Commissioner is reversed and the case is remanded to the Commissioner for further proceedings consistent with this opinion. The motion for summary judgment is DENIED in all other respects.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 19] on February 27, 1998, with appeal to the Court of Appeals.

SO ORDERED.